## MRS. ELLA WALKER v. M. L. WALKER et al.

Middle Section. December 19, 1925.

Certiorari denied by Supreme Court February 27, 1926.

1. **Reformation of instruments. When proper. Parties.**
   Court will not interpose to reform an instrument in behalf of one who is not a party to the instrument nor claiming any privity with a party.

2. **Reformation of instruments. Equity will reform instruments only when there is either fraud or mistake.**
   Equity has jurisdiction to reform written instruments in but two well-defined cases; 1. Where there is a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form does not express what was really intended by the parties thereto; and 2. Where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. In such cases the instrument may be made to conform to the agreement or transaction entered into according to the intention of the parties.

3. **Reformation of instruments. Waiver of right to reformation.**
   If a party acquiesces in an instrument after becoming aware of the mistake he loses his right to reformation. The acquiescence may be direct or implied. Acquiescence in a written instrument may be implied from an unreasonable delay in applying for redress after getting notice of the mistake.

4. **Reformation of instruments. Evidence.**
   In an action by a widow to reform a deed which was taken in the name of her husband where the evidence showed that the parties had intended to have it taken in them jointly, but the husband at the time of the delivery of the deed learned of the error and advised his wife and she took no steps to have the instrument changed until after his death, held that she had waived her right to have the instrument reformed.

5. **Pleading. Scope of prayer for general relief in an equity suit.**
   In an action by a wife asking to have a deed reformed wherein the prayer ended with "that such other relief be granted her as may appear proper," held to justify a decree giving her a trust estate in the property.

6. **Trusts. Resulting trusts.**
   Where a resulting trust is sought to be established in land purchased by the husband with the wife's funds and title taken in his name, held the trust arises if at all from the act of payment of the consideration by the cestui que trust, and not from any agreement of the parties. The trust must arise out of the state of facts existing at the time of purchase, and attach to the title at that time, and cannot arise out of any subsequent contract or transaction.

7. Trusts. A trust does not result merely from the breach of a parol contract.

A trust results from the acts, and not from the agreements, of the parties, or rather from the acts accompanied by the agreements; but no trust can be set up by mere parol agreement, or, as has been said, no trust results merely from the breach of a parol contract; as if one agrees to purchase land and give another interest in it, and he purchases and pays his own money, and takes the title in his own name, no trust can result.

8. Trusts. Payment raises a presumption of a trust.

The payment by one raises the presumption of a trust in his favor but such presumption may be rebutted by proof that a gift or a loan was intended.

9. Trusts. No trust results for the wife where the husband uses property he had right to reduce to possession.

If a husband purchase lands with the separate estate of his wife in his hands, or with the proceeds or accumulations from it, or money put into his hands to invest for his wife, and take the title in his own name, a trust, results to the wife but not if the property used is such as the husband has a right to reduce to possession and make his own, and his conduct evinces an intent to do this.

10. Trusts. Since Act of 1913 husband is considered agent of his wife and investment of her money creates a trust.

The Act of 1913, chapter 26, destroyed the right of husband to reduce to possession his wife's personalty and the husband is now treated as the wife's agent where he comes into the possession of her property and manages and invests it and if he purchases land and takes the title to himself, a trust will result to the wife.

11. Trusts. Resulting trust may be established by parol evidence.

Parol evidence is admissible to establish a resulting trust. It is admitted not to show an agreement of purchase for another but to show that the purchase money was paid by the party claiming notwithstanding that the deed was taken in the name of another person.

12. Trusts. Parol trusts must be established beyond a doubt.

Trusts may be established by parol testimony but the evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged beneficiary beyond a doubt.

13. Trusts. Evidence.

Evidence examined and held sufficient to establish a parol trust.

14. Trusts. Estoppel. Right to set up a resulting trust held waived.

In an action by a widow to gain title to a farm in her husband's name where the evidence showed that there was a disagreement between the widow and the heirs of the husband as to her right to the farm and that they executed, and she accepted, a deed to a life estate in the farm and retained the same for several months and at no time offered to surrender it, held that though the evidence established a resulting trust, she was estopped to set up the same.

15. Trusts. Cestui que trust is entitled only to proportionate part of present value of the property.

Where a wife's money is put in a farm, title of which is taken in the husband's name, and a resulting trust is established, the wife is not entitled to recover back the money placed in the farm but is entitled to the proportionate part of the present value of the same, in the proportion which the amount invested bears to the entire amount paid.

Appeal from Part I, Chancery Court, Davidson County; Hon. John R. Aust, Chancellor.

Reversed.

J. B. Daniel, of Nashville, for appellants.

Noah W. Cooper, of Nashville, for appellees.

FAW, P. J. W. M. Walker, commonly known among his intimates as "Buck" Walker, died childless in the month of August, 1921. This record presents a controversy between his widow and his heirs at law, concerning the ownership of a tract of about one hundred acres of land situated in the third civil district of Davidson county, Tennessee, about fifteen miles from the city of Nashville.

The land in controversy was conveyed by the defendant M. L. (Marcus) Walker to W. M. (Buck) Walker by deed dated and acknowledged on January 27, 1920, and registered in the Register's Office of Davidson county on February 2, 1920, and which deed purported to convey the land therein described to Buck Walker in fee simple absolute. The deed recited that it was made in consideration of $2,100 paid in cash by W. M. Walker (the grantee), the receipt of which was acknowledged by the grantor, M. L. Walker.

At the time of his death, Buck Walker and his wife, the complainant, were living on the land thus conveyed and the title, as vested in Buck Walker by the aforesaid deed of Marcus Walker, had not been disturbed. Apparently, therefore, the title passed to the heirs at law of Buck Walker, subject to the homestead and dower rights of his widow.

The bill in this case was filed by the widow, Mrs. Ella Walker, against all the heirs at law of Buck Walker (his surviving brothers and nephews and nieces) for the purpose, according to the prayer of the bill, of obtaining a reformation of the said deed of January 27, 1920, made by Marcus Walker to Buck Walker. Complainant alleges that $1,340 of her money was used by her husband, in the purchase of said land, pursuant to an express agreement between her husband and herself that the deed should be made to them (complainant and her husband) "in such form that the survivor of them would take and own the whole place in fee absolutely," or, as stated elsewhere in the bill, that the deed "should be so written that the title would be vested in them both and so the survivor of them would take the entire fee of the whole place."

The prayer of the bill is "that said deed be reformed to show and make it as it should have been made under said agreement," and that complainant "be vested with absolute title to the whole of said farm in fee."

The issues made by answer of defendants to the complainant's bill may be more conveniently stated if we first state certain undisputed facts appearing from the record.

M. L. (Marcus) Walker and W. M. (Buck) Walker were brothers. Buck's age is not shown, but he was older than Marcus and Marcus was sixty-four years of age when his deposition was taken in July, 1923. Complainant Mrs. Ella Walker was fifty-four years of age in July, 1923. Complainant had been living on the farm in controversy since the year of 1897. Her husband, Buck Walker, was in possession of the farm as tenant of Marcus, the owner, from December, 1897, until April, 1917. During this period of nearly twenty years, Marcus demanded and received only a small sum as rental for the property. His testimony is that "they just paid a little rent, they didn't pay enough to pay the taxes on the property." When Complainant was asked, "what rent did you pay for it?" she replied, "part of the time we gave cows and then money and put improvements on the place. We gave a cow a year and some work on another place for several years."

In April, 1917, Marcus and Buck entered into a parol agreement for the sale and purchase of the farm in question at an agreed price of $2,100, and later, on the 21st of the same month, Buck paid Marcus $300 of the purchase-price. Between that time and the 27th day of January, 1920, Buck paid to Marcus $1,500 more. Marcus, who was a bachelor and had "saved up some money," decided to and did distribute, among his six brothers and sisters (those who were dead being represented by their children) all of the sum received for said sale, except one share reserved for himself. In other words, Marcus and Buck were members of a family of seven brothers and sisters, and Marcus treated the purchase-price of the land ($2,100) as divided into seven shares of $300 each, one of which he retained for himself and one he paid to each of his brothers and sisters, or their representatives. With this voluntary distribution in view, Marcus did not go through the idle ceremony of requiring Buck to pay him the full amount of $2,100, and then handing back $300 to Buck, but pursued the more direct route of "releasing" Buck from the payment of $300 of the consideration for the land.

We shall treat the consideration passing to Marcus for the conveyance of the land as $2,100, rather than $1,800. The relevancy of this fact to the issues in the case will appear later.

The payment of the purchase-price having been completed, Marcus executed and acknowledged a deed to Buck on January 27, 1920, as before stated. This deed was delivered to Buck on February 2, 1920, and was by him, on the same day, handed to the Register of Davidson county for registration. Either on the same day or shortly thereafter, Buck Walker carried said deed to his home and handed it to complainant, and it remained in the custody of complainant, or her attorney, until it was filed as a part of the record in this case.

In November, 1921 (three months after her husband's death), complainant attempted to procure a quit-claim from the heirs at law of her deceased husband "of their right, title, claim and interest of every character and kind" in and to the land in question, but they declined to execute such an instrument. However, they indicated their willingness to release and quit-claim the entire farm to complainant "for her use for her lifetime," and in November, 1922, the heirs at law of Buck Walker executed an instrument prepared by complainant's attorney, as follows:

"State of Tennessee. Davidson county.

"Whereas in August, 1921, W. M. Walker died without children, leaving his widow Ella Walker, who is now residing on the home place below described; now desiring to assure to said widow a lifetime right to use said home place, we the only heirs at law of said W. M. Walker to-wit: a brother, M. L. Walker, unmarried; a brother, J. J. Walker and his wife Nancy Walker; a sister, Mrs. Fannie Greenhalge, a widow; a brother, S. R. Walker, with his wife Jane Walker; a niece, Lucy Cone, only child of her deceased mother, Allie Walker Kimbro (sister of W. M. Walker) with her husband A. G. Cone; a nephew, W. K. Walker, a nephew, R. L. Walker and wife Mary Walker, a nephew, L. T. Walker and wife Marion Walker and a niece, Azzle Hixson with her husband, L. B. Hixson (these last four being the only children and heirs at law of S. H. Walker, a deceased brother) do hereby out of kindness to said widow Ella Walker convey, release and quit-claim unto said Ella Walker for her use for her lifetime the said home place in the third Civil District of Davidson county, Tennessee, containing by estimate about one hundred acres beginning in the centre of the creek, running thence south 85 and 3/4, west 106 and 3/5 poles to a rock; thence south 55 poles to a stake; thence south 56 west 74 poles to stake; thence north 88 and 1/4 west 24 and 1/2 poles with Hamilton Road to L. A. Olds corner; thence south 1 west 14 poles to a rock; thence south 60 east 100 poles to a stake; thence south 69 and 1/4 east 14 poles to a stake; thence 38 poles to centre of creek; thence with centre of creek 201 and 1/2 poles to the beginning, J. H. Charleston's southeast corner; being the same place deeded by M. L. Walker to W. M. Walker January 27, 1920 as per Register's Office in Book 542, page 336. The respective wife or husband of the parties hereto join herein. Witness our hands this Nov., 1922."

The foregoing "release and quit-claim" was delivered to and accepted by complainant, and she still retains same, and without making any offer to surrender the benefits, if any, which she may have acquired thereby, she filed the bill in this case on April 14, 1923—more than three years after the land was, to her knowledge, conveyed to her husband alone.

In addition to the averments in her bill which we have already mentioned, complainant alleged that when Buck Walker, her then husband, brought the aforesaid deed made by Marcus Walker to their home a few days after February 2, 1920, and showed it both to her that he stated that he was sorry it was not made to them both as they had agreed; that when he called for the deed, Marcus Walker had it already written out and signed and acknowledged; that he (Buck) told Marcus that he didn't want it that way, as he and his wife had agreed that it should be deeded to both and he intended and wanted it made to both; that Buck stated that he took it as it then was rather than go to the expense and trouble of having it all done over, and that he would make a will, or other legal paper, so as to vest her with the same rights in the farm that she would have had if the deed had been written as said agreement provided; that, confiding in him, she trusted him to do as he promised and so fix the title that the survivor of them would take the whole place; that he did consult with one or more persons and she supposed that he had so arranged that the survivor of them would take the whole place, but after his death no will or other paper of his could be found vesting title to the place in him and her as they had agreed; that she and members of his family thought he had made a will, but none was found, and complainant charges that her deceased husband did not make a will.

Complainant further alleged in her bill that she told the heirs of her husband of the aforesaid agreement and asked them to make a deed to her, but "she failed to get the consent of all;" that after she became administrator of his estate, desiring to avoid a chancery suit, she filed a claim for the said $1,340 with the county court clerk; that the place is poor, not worth so very much, and she felt that if this claim of $1,340 were allowed her, it would in a measure compensate her for her loss; that upon the hearing the clerk of the court, and on her appeal the circuit judge, held that her claim was not a proper one to be filed as a debt or demand against her husband's estate; that both the clerk and the circuit judge dismissed her said claim, without hearing any proof, on the ground that her claim was one purely for the chancery court, and that her claim showed on its face that she should go to the chancery court for relief through a decree setting up a resulting trust in her favor.

In their answer, which was filed on May 22, 1923, the defendants admitted that complainant Mrs. Ella Walker is the widow of W. M. Walker, who died intestate, and without issue, in Davidson county in August, 1921; but defendants deny that complainant has any just or legal claim against the estate of her deceased husband. They deny that complainant paid for the land mentioned, in whole or in part, with her separate estate, or any of her estate. They deny the existence of any agreement between complainant and her husband,

as to how the title to the farm should be taken and held. They deny that there was any contract or agreement that a court can enforce, either by reforming the deed or by allowing a claim against the estate in her favor.

They aver that if complainant had any rights in the premises growing out of the alleged fraud or breach of faith (of her husband) she should have asserted it during his lifetime, and should not have waited until he was dead, and long afterwards, to assert her alleged demands and "blacken his good name and befoul his memory by bringing up such charges at this time;" that complainant could have taken steps at once, upon discovering the fraud and breach of faith, to have had the matter corrected and, having failed to do so, she is now estopped and will not now be heard to set up the claim for $1,340 or for the reformation she now seeks at this time.

Defendants say in their answer that they are advised and state the facts to be that M. L. Walker conveyed the land in question to his brother W. M. Walker for $2,100, and released $300 of this when it was in fact worth $3,000, and conveyed it to him for this small sum with the distinct understanding and agreement with him that, as he had no children, at the death of himself and his wife the farm should "come back to the Walker heirs;" that it was understood between defendant M. L. Walker and said W. M. Walker that he (W. M. Walker) and his wife should have the farm during their lives, but at the death of the longest liver it should belong to the Walker heirs.

Defendants state further that after the death of W. M. Walker, it was learned that he had not so arranged that his widow should have the land for her life, and thereupon all the Walker heirs joined in a gift to her in which they deeded her a life estate therein; that complainant accepted this deed and had it recorded, in full satisfaction of all her claims and demands, and is now estopped to make the claims and have the relief she seeks in her present bill. The answer concludes with a general denial of each and all the allegations of the bill not specifically admitted or denied in the answer.

Proof was taken on behalf of the parties, respectively, and thereafter (on April 9, 1924) a decree was pronounced and entered as follows:

"This case came on to be heard and was regularly heard by Hon. John R. Aust, Chancellor, upon the pleadings, proof and argument of counsel. Upon consideration for all of which the court was of opinion and found that the allegations of the bill are sustained by the proof; that there was a valid agreement between complainant Ella Walker and her husband W. M. Walker (now deceased) that the deed in question to the farm where they were living, and which farm they were buying; should be written to them both as conveyees and so that the survivor of them would take the fee-simple title to

the whole farm, that she had a separate estate in personalty; that she permitted her husband W. M. Walker to use her said separate estate in personalty amounting to $1,340 or approximately that amount, in helping to pay M. L. Walker the purchase-price for the farm, with the agreement with him that the deed to be made by M. L. Walker, defendant, should be so written to them jointly that the survivor of them would take the fee-simple title to the whole farm, that the deed in question should have been so written; that complainant would not have permitted her said separate personalty to have been thus used save for this agreement; that W. M. Walker meant for said deed to be written as complainant in her bill insists, and that he took the deed from M. L. Walker averring it was not like he wanted it written, and that he wanted her name in it, and that he delivered the deed to his wife with apologies, averring it was not like he and she had agreed it should be, and that he would have a new deed made, or make a will, or in some way fix it so that she would have the same rights in the farm that she would have had if the deed had been written as they had agreed, as above stated; that she confidingly relied on him to fix it so the survivor of them would take the fee to the entire place; that though he started to make a will, he did not do so, and died without having done so; that Mrs. Ella Walker, complainant, is entitled to have said deed reformed and made to read as a deed from M. L. Walker to W. M. Walker and wife Ella Walker, with right in the survivor; W. M. Walker took the deed as he received it as trustee to execute the terms of said agreement between him and complainant as to the vesting of title in them so that the survivor would take the fee in the farm. The court therefore adjudge and decrees that said deed made Jan. 27, 1920, by M. L. Walker to W. M. Walker, of record in Book 542, page 336 of the Register's Office of Davidson county, Tennessee; conveying the farm where complainant then lives and now lives, be corrected, changed and reformed so as to read and be effective as a deed from said M. L. Walker to W. M. Walker and wife Ella Walker, with right in the survivor of the two to take the fee-simple title to the farm in question; and since complainant survived her husband, W. M. Walker, the court adjudges and decrees that she, complainant Ella Walker, is now the sole and rightful owner in fee of said farm in the Third Civil District of Davidson county, Tennessee, containing by estimate one hundred acres beginning in the center of the creek, running then south 85 and 3/4 degrees west 106 and 3/5 poles to a rock; thence south 55 poles to a stake; thence south 56 degrees west 74 poles to a stake; thence north 88 and 3/4 degrees west 24 and 1/2 poles with the Hamilton Road to L. A. Olds corner; thence south 1 degree west 14 poles to a rock; thence south 60 degrees east 100 poles to a stake; thence 69 and 1/4 degrees east 14 poles to a stake;

thence 38 poles to the center of a creek; thence with the center of the creek 201 and 1/2 poles to the beginning; it being the farm where complainant is now living. The court decrees that all right, title, claim and interest of all the parties to this suit, including all the heirs of said W. M. Walker, the defendants in this cause, be divested out of them and be and is hereby vested in complainant Ella Walker; this being done to remove all cloud from her title.''

In the hearing and consideration of this cause the court ruled out and did not consider the deposing statements of Complainant Ella Walker as to statements by or transactions with her husband, except such of her statements as purported to be statements by her husband to her in the presence and hearing of other parties; the court holding that under the law statements by her as to conversations between them, with no other present, were incompetent and could not be considered. The court did not consider that complainant's testimony was incompetent under section 5598 of Shannon's Code, inasmuch as complainant's suit was against the heirs at law of W. M. Walker and did not seek judgment against the administrator of W. M. Walker's estate.

The court also sustained complainant's exception to that portion of defendant's witnesses as undertook to prove the trade, was that the deed was only to pass title to Walker and wife for life and then revert to the Walker heirs because it contradicts the written instrument and there is no pleading on part of defendants seeking to thus reform it.

The court decrees that the costs of this cause be paid by the defendants, except Horace Osment, administrator ad litem who was only a nominal party defendant.

To all of which defendants except and pray an appeal to the next term of the Supreme Court of this State which is granted upon the execution of an appeal bond in the sum conditioned as required by law.''

The defendants perfected their appeal to the Supreme Court, but the case was, by that court, transferred to the Court of Civil Appeals, and, since the reorganization Act of 1925, chapter 100, the case has been submitted to the Middle Section of the Court of Appeals for decision upon the record, assignments of error, and briefs.

We shall not undertake to deal with the assignments of error in the order in which they are presented by appellants, but will dispose of the questions of fact and law raised by the assignments in the order which to us seems most convenient.

The decree of the Chancellor is a direct response to the specific prayer of the bill, in that, it decrees a reformation of the aforesaid deed of January 27, 1920, so that said deed, instead of being a conveyance by M. L. Walker to W. M. Walker of the title to the land

therein described, in fee simple, is "corrected, changed and reformed so as to read and be effective as a deed from said M. L. Walker to W. M. Walker and wife Ella Walker, with right in the survivor of the two to take the fee-simple title to the farm in question."

If this case be confined to the undisputed facts of the record, plus the complainant's version of the disputed facts, it does not, in our opinion, afford a proper basis for a reformation of the deed of January 27, 1920.

Complainant was not a party to the instrument which she seeks to reform, and she is not claiming through or in privity with either of the parties, but adversely to them. Courts will not interpose to reform an instrument in behalf of one who is not a party to the instrument nor claiming any privity with a party. 23 R. C. L., pp. 308, 338-339.

Moreover, if we should hold (which we do not) that the relation of the complainant to the deed in question was such as to entitle her to sue for a reformation, we should nevertheless be constrained to hold that the facts of this record do not justify a reformation of said deed at the suit of anyone. The terms and provisions of the deed were not the result of fraud or mistake, in a legal sense, and "in the absence of satisfactory proof of either fraud or mistake, there is no basis for a court of equity to reform an instrument." 23 R. C. L., p. 320.

"Equity has jurisdiction to reform written instruments in but two well-defined cases: 1. Where there is a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto; and 2. Where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. In such cases the instrument may be made to conform to the agreement or transaction entered into according to the intention of the parties." 4 Pom. Eq. Juris. (4 Ed.), sec. 1376.

It cannot be doubted on the record that the parties to the deed of January 27, 1920 (Marcus Walker and Buck Walker) clearly understood the terms and legal effect of that deed. Marcus Walker was asked, "what are the facts about the name of Mrs. Walker not being in the deed," and he replied as follows:

"When Buck came to get the deed he said that he wanted something in the deed so that she would be sure if he died to have a life estate, and I told him then if he wanted me to, that it hadn't been recorded, I would have it changed. He said, "No, that is all right, that I will go and have it recorded and I will make a will and leave her a life interest."

Complainant stated in her testimony that her husband brought the deed from Nashville to their home on Saturday in February, 1920, and showed it to her. She was then asked, "what did he do or say when he showed this deed to you," and she answered as follows:

"He said here is the deed Ella; it is not like our agreement. He said the deed was already fixed as it was when he got to town and got it from Marcus; that he told Marcus the deed was not written out according to our agreement and that he wanted it fixed to read according to our agreement. He said Marcus told him he could have it changed but that he told Marcus Walker (from whom we bought the place) that since he had paid for it, and it was all written up that he would just let it go as it was and have a will made or other paper so that my interest in the place would be the same as if my name had been written in the deed with his name."

Complainant states that, upon receiving the assurance from her husband that he would make a will, or execute a "paper" of some sort, that would give her the interest in the property that she had understood that she was to have, she put the deed away at their home and relied on her husband's promise.

It thus appears that the deed was drawn as Marcus intended, and that Buck accepted it and had it registered, with full knowledge of its terms and legal effect, and that complainant was likewise fully cognizant of the fact that the deed did not purport to convey to her any interest in the land therein described. With this knowledge, complainant kept the deed in her custody, without complaint to the maker of the deed, for more than eighteen months until her husband died, and then for an additional period of more than eighteen months before bringing this suit, during which latter period she accepted a deed from Buck Walker's heirs for a life estate in the land in question.

"If a party acquiesces in an instrument after becoming aware of the mistake, he loses his right to reformation. The acquiescence may be direct or implied. If for instance a deed, through mistake, conveys too much land, the vendor cannot have it corrected if, after the discovery of the mistake, he receives the purchase money and yields possession to the vendee. The acquiescence in the written instrument may be implied from an unreasonable delay in applying for redress after getting notice of the mistake. Of course there can be no acquiescence unless the party knows of the error in the instrument or the circumstances are such that he will be presumed to know of it." 23 R. C. L., pp. 347-348.

The legal theory upon which complainant's bill was drafted, viz: that, upon the facts stated in the bill, complainant is entitled to a reformation of the deed of January 27, 1920, in the manner prayed

for, is in our opinion, erroneous; and, in this respect, the learned Chancellor fell into error in his decree.

But it does not follow, necessarily, that, by reason of the error just pointed out, complainant is entitled to no relief. This depends, under the record in this case, upon other considerations.

It will be remembered that complainant alleges in her bill that $1,340 of the purchase-price of the land in question was paid out of her separate estate upon an agreement between her husband and herself that the title should be taken to them jointly, as tenants by the entirety, and, at one place in her bill, she alleges that "this use of her separate property created a resulting trust in her favor in said land." After her prayer for the specific relief before mentioned (that is, for a reformation of the deed), complainant prays "that such other relief be granted her as may appear proper."

We are of the opinion that the last-mentioned averments of the bill, and the prayer for general relief, will justify a decree adjudging that W. M. Walker took and held title to the land in controversy as trustee for complainant (under the doctrine of resulting trust) to the extent which $1,340 bears to the whole consideration of $2,100; provided, the proof is sufficient to sustain such allegations of the bill, and does not sustain the defenses of laches, acquiescence and estoppel interposed by the defendants. An analogous situation was presented in the case of Johnson v. Anderson, 7 Baxt., 251, 255, wherein the reformation of a deed was the specific relief prayed for in the bill. In the opinion of the court in that case it is said:

"Although the bill seems to have been framed upon the idea that the deed to the mother and children was executed by mistake, and prays, in this aspect of the case, to have the mistake corrected, yet the facts alleged show that the money and credit of complainant bought the land, and that he paid the whole of the purchase money, although the deed was taken in the name of others; and these facts constitute a resulting trust. The evidence very fully and satisfactorily establishes the truth of these allegations, and entitles the complainant to relief under his prayer for relief upon the facts stated in the bill.

"The Chancellor so held, and we affirm his decree."

We shall therefore inquire whether the record establishes a "resulting trust" in favor of complainant. In this connection, the determinative fact to be ascertained is, whether the land in question was, in part, bought and paid for with complainant's funds.

The alleged parol agreement, that the title should be taken in such way that if complainant survived her husband she would become the owner of the whole estate in fee, would, if proven, avail complainant nothing.

The trust arises, if at all, from the fact of payment of the consideration by the cestui que trust, and not from any agreement of the parties. 1 Perry on Trusts (4 Ed.), secs. 134-135; Pillow v. Thomas, 1 Baxt., 120, 142; McClure v. Doak, 6 Baxt., 364, 370; Sullivan v. Sullivan, 86 Tenn., 376, 371; Perkins v. Cheairs, 2 Baxt., 194, 200; Wells v. Stratton, 1 Tenn. Chy., 328, 332, 336-7; Jackson v. Jackson, 3 Shan. Cas., 19, 29; Gee v. Gee, 2 Sneed, 395, 403; Clark v. Timmons (Tenn. Chy. App.), 39 S. W. R., 534, 535.

The trust must arise out of the state of facts existing at the time of the purchase, and attach to the title at that time, and not arise out of any subsequent contract or transaction. McClure v. Doak, 6 Baxt., 364, 369; Gee v. Gee, 2 Sneed, 395; Sullivan v. Sullivan, 86 Tenn., 376, 381.

If the agreement was that the husband would, at some indefinite future time, convey the land to his wife, such an agreement was a parol promise to convey land, and void under the statute of frauds. Pillow v. Thomas, 1 Baxt., 120, 142; McClure v. Doak, 6 Baxt., 364, 370; Campbell v. Taul, 3 Yerg., 548, 558.

Payment must be made, or absolute obligation to pay incurred, "as a part of the original transaction of purchase, at or before the time of the conveyance; no subsequent and entirely independent conduct, intervention, or payment on his part would raise any resulting trust." 3 Pom. Eq. Juris, (4 Ed.), sec. 1037, and cases in Note d; 1 Perry on Trusts (4 Ed.), sec. 133.

"A trust results from the acts, and not from the agreements, of the parties, or rather from the acts accompanied by the agreements; but no trust can be set up by mere parol agreements, or, as has been said, no trust results merely from the breach of a parol contract; as if one agrees to purchase land and give another an interest in it, and he purchases and pays his own money, and takes the title in his own name, no trust can result." 1 Perry on Trusts, (4 Ed.), sec. 134.

"It is a familiar rule that a trust must result, if at all, at the instant the deed is taken and the legal title vests in the grantee. No oral agreements, and no payments before or after the title is taken, will create a resulting trust, unless the transaction is such that, at the moment the title passes, a trust will result from the transaction itself. There must be an actual payment from a man's own money, or what is equivalent to payment from his own money, to create a resulting trust." Clark v. Timmons et al. (Tenn. Chy. App.), 39 S. W., 534, 535.

The payment by one raises a presumption of a trust in his favor. Spofford v. Rose, 145 Tenn., 583, 596; Dudley v. Bosworth, 10 Humph., 12.

But such presumption may be rebutted by proof that a gift or a loan was intended. 3 Pom. Eq. Juris. (4 Ed.), sec. 1040, Note c; 1 Perry on Trusts (4 Ed.), sec. 126.

"If a husband purchase lands with the separate estate of his wife in his hands, or with the proceeds or accumulations from it, or money put into his hands to invest for his wife, and take the title in his own name, a trust results to the wife (but not if the property used is such as the husband has a right to reduce to possession and make his own, and his conduct evinces an intent to do this)." 1 Perry on Trusts (4 Ed.), sec. 127, p. 148, citing (among other cases) Pritchard v. Wallace, 4 Sneed, 405.

"Whether an act of the husband in converting a chose in action of the wife is a reduction into possession depends upon his intention. If he actually collect the money, but only as the agent of the wife, and invest it in property for her benefit, the property will belong to the wife, even against the husband's creditors, although the title be taken to the husband." McCampbell v. McCampbell, 2 Lea, 661, 663.

In numerous Tennessee cases involving the establishment of resulting trusts in favor of married women (prior to the Act of 1913 emancipating married women from the disability of coverture) an important consideration was an agreement of the husband that the wife's funds should be invested in land for her benefit. · As illustrative cases, see Click v. Click, 1 Heisk., 607; Pillow v. Thomas, 1 Baxt., 120, 128; Hyden v. Hyden, 6 Baxt., 406, 408; Insurance Co. v. Shoemaker, 95 Tenn., 72; Bibb v. Smith, 12 Heisk., 728, 730; Pritchard v. Wallace, 4 Sneed, 405, 410; Ex Parte Yarbrough, 1 Swan, 202, 206; Chester v. Greer, 5 Humph., 25, 34; McClure v. Doak, 6 Baxt., 364, 368; Embry v. Robinson, 7 Humph., 443, 446.

Although the courts frequently omitted to state in their opinions the reason for the consideration of the husband's agreement that the wife's funds might be invested for her benefit, it is, we think, obvious that such agreement on the part of the husband was material only because, if established, it conclusively excluded an intention on the part of the husband to assert his marital right to his wife's personalty. In other words, the trust in favor of the wife resulted from the investment of her funds in the land, and not from the agreement of the husband; but the agreement of the husband was an important fact bearing upon the question of whether the funds invested in the land belonged to the wife or to the husband.

Since the Act of 1913, chapter 26, destroyed the marital right of the husband to reduce to possession his wife's personalty, the agreement and consent of the husband that the wife's money should be invested in land for her benefit is no longer an important element in the establishment of a resulting trust in favor of the wife.

Having no power to reduce the wife's funds or property to possession for his own benefit, the husband will be treated as the wife's agent, where he comes into possession of her property and manages or

invests it with her consent. "If an agent, with the money of his principal, purchases land and takes the deeds to himself, a trust will result to the principal." 1 Perry on Trusts (4 Ed.), sec. 127, p. 147; Hale v. Hale, 4 Humph., 183, 185.

And "where two or more persons together advance the price, and the title is taken in the name of one of them, a trust will result in favor of the other with respect to an undivided share of the property proportioned to his share of the price." 3 Pom. Eq. Juris. (4 Ed.), sec. 1038; Bible v. Marshal, 103 Tenn., 324, 329; Tarbox v. Tonder, 1 Tenn. Chy., 163, 168; Pritchard v. Wallace, 4 Sneed, 405, 411; Perkins v. Cheairs, 2 Baxt., 194, 199; 1 Perry on Trusts (4 Ed.), sec. 126, p. 145 and sec. 132, p. 154.

Under practically all the modern authorities, a resulting trust may be established by parol evidence.

"The parol testimony is admitted, not to show an agreement to purchase for another, but to show that the purchase money was paid by the party claiming, notwithstanding the deed was taken in the name of another person." Perkins v. Cheairs, 2 Baxt., 194, 201.

But a mere preponderance of the evidence will not suffice. In 3 Pom.'s Eq. Juris. (4 Ed.), sec. 1040, it is said that "it is settled by a complete unanimity of decision that such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged beneficiary beyond a doubt."

It has been held in this State that the courts will not enforce a resulting trust unless it "is established by the most convincing and irrefragable proof." Holder v. Nunnelly, 2 Cold., 288, 289; Hyden v. Hyden, 6 Baxt., 406, 407.

In Sandford v. Weeden, 2 Heisk., 71, 76, the court, speaking with reference to the quantum of proof requisite to establish a resulting trust in cases of the character here under consideration, said that different judges have employed different language in declaring the character and weight of the proof necessary and sufficient to set up a resulting trust; that the result of all the attempts to define the rule as to the amount of parol proof necessary in such cases is, that the conscience of the court should be fully satisfied that the facts relied on to raise the trust are true, and sufficient to create the trust, and that the proof, whether parol or written, must be such that the court is fully satisfied that the funds of the cestui que trust, and not the funds of the holder of the legal title, were used in the purchase of the property.

It appears from the record, without dispute, that Buck Walker sold two jacks for $500 each, a grey mare and two mules for $190, and another mule for $150, and turned over the proceeds of these sales to Marcus Walker as payments on the purchase-price of the farm in question. These items aggregated $1,340. Complainant as-

serts that she was the owner of all of the live stock above mentioned, and that her husband sold it for her and invested the proceeds in the Marcus Walker land with her consent upon his agreement to take the title in the manner hereinbefore stated.

Long before married women in this State were emancipated from the common-law disabilities of coverture, it was held that the husband might be constituted agent of the wife to make such a purchase as that contended for by complainant in this case. Ready v. Bragg, 1 Head., 511, 515. Therefore, a fortiori, there is no legal obstacle, since the Emancipation Act of 1913, which would prevent a wife from making her husband her agent to sell her personalty and invest the proceeds in land for her benefit. 13 R. C. L., p. 1167.

Complainant was asked where she got the stock that was her separate estate on the farm, and she replied as follows:

"My husband was about to kill a sick calf full of sores. I begged him to give the calf to me. He said he would if I would keep it out of his sight as it was full of sores and he feared he'd lose his taste for milk. I promised and he gave me the calf as mine. I nursed it for three months; cured it; it grew to be a fine cow. I sold the cow to Mrs. Grewar for $50 and with this $50 I bought my grey mare; and this mare nursed the first mule I sold for $85; with this $85 I bought my jennet and colt; and my jennet had six jack colts; and they were all mine; two of them were sold for $500 each and this $1,000 went to help buy the farm. This very grey mare and her two mules sold for the $190 that went to help pay for the place. Another of the mare mules sold for the $150 that went to pay for this farm."

Complainant further testified, in this connection, that her husband recognized her as the owner of "all this stock that came from the sick calf and the money that came from it;" that her husband always got her advice and consent to the sales of her stock; and that he had no other way to pay the $2,100 for the farm except by using complainant's money realized from the sale of her stock as aforesaid.

The complainant's testimony concerning the statement of her husband that he would give her the calf, and his statement to her that he had used the checks obtained from her stock, to help pay for the farm was, on objection, excluded by the Chancellor because it was evidence of "statements by or transactions with her husband" not in the presence and hearing of other persons. The exclusion of this testimony by the Chancellor was proper. Pillow v. Thomas, 1 Baxt., 120, 129; Insurance Co. v. Shoemaker, 95 Tenn., 72, 82; Crone & Co. v. Hall, 141 Tenn., 556, 563; Burnett v. Campbell County, 1 Wright Chy. App., 28.

But, whether rightly excluded or not, we cannot consider complainant's testimony that her husband said he would give her the sick calf, because, after its exclusion, it was not restored to the record by a bill of exceptions or other appropriate method.

There is, however, much evidence that Buck Walker, the alleged agent and trustee of complainant, admitted that complainant was the owner of the live stock which he sold and invested in the land as aforesaid. The declarations of the trustee may be received in evidence to establish a resulting trust. 26 R. C. L., p. 1229.

Miss Louella Seat lived with Buck Walker and his wife, as a member of their family, for about seven years before Buck Walker's death. She testified that complainant claimed the grey mare and jennet and colts as her property; that witness had heard Mr. Walker say that the jennet and the grey mare were Mrs. Walker's property, and that she heard Mr. Walker tell Mrs. Walker that the money he got for the jacks and mare and mules "went on paying for the place."

J. T. Whitely owned a place near to the farm in question and lived as a neighbor of complainant and her husband for many years. This witness stated that he knew complainant owned a jennet and a jack colt, and when he was asked how he knew that, the witness replied as follows:

"One day my wife and I went to Mr. W. M. Walker and Mrs. Ella Walker's to get some vinegar. Mrs. Walker, as I recall, went to get the vinegar and my horse got to prancing around the jack colt; and I looked at the jennet. She was a fine looking jennet; and I said to Mr. W. M. Walker 'Buck how much did that jennet set you back?' And Mr. Walker replied 'she cost $85—I got the money from my wife to buy her and she belongs to my wife.'"

Sam Burnett was a near neighbor and intimate friend of Buck Walker and his wife, and he testified that Buck had told him that the jennet and her offspring and a mare on the place belonged to his wife (the complainant), and that he had sold the jacks and some other stock belonging to his wife and had used the proceeds to pay on the place.

We quote from the testimony of John Williams, another witness for complainant, as follows:

"Q. Who owned the live stock on the farm where complainant and Mr. W. M. Walker lived in 1917, 1918 and along there? A. Mr. W. M. Walker told me that his wife owned a grey mare. I tried to trade him out of her, but he wouldn't; said she was Mrs. Walker's. Then I tried later to get him to let me have three head (two mule colts) and grey mare for my four-year-old mare mule. He said he couldn't do it, that they belonged to his wife and if he traded her three head for my mule, his wife would comb his head when she found it out.

3. "Q. How close did you live to them? A. About half a mile.

4. "Q. Did Mrs. Walker work any on the place? A. Yes—she did all manner of work.

5. "Q. Whose money or stock went to buy the place for Mr. W. M. Walker? A. He said his wife's money went to buy the grey

mare. This grey mare and mules were sold, so Mr. Walker told me, to get money to make a payment on the farm.

"I saw Mr. Walker nearly every day and saw these jacks being raised there and he often asked me over to look at them and see what I thought of them, and wanted me to help get a buyer; that he wanted to sell 'em and make a payment on the place with them.

"He did sell I think, three jacks or four. I forget what he got for them. Mr. Walker did tell me more than once that he sold some of the stock and had made payments on the place they were buying. He had a blue jack colt; best they ever had had there. They had also some black jack colts. He said he didn't think so much of the blue jack; and I said 'if you don't like this blue jack give him or sell him to me.' Mr. Walker replied 'those jack colts are all Mrs. Walker's and she likes one just as good as another, she wouldn't agree to it.'

"He did sell the blue jack for $500, I think."

The complainant's witness A. G. Burnett testified as follows:

1. "Q. State your age, residence and occupation? A. I am eighty and past; reside nine miles from Nashville near Una; am a farmer and stock dealer.

2. "Q. State what you know as to the purchase of the farm from Mr. Marcus L. Walker by W. M. Walker (Buck) Walker and his wife Ella, complainant? A. I know nothing as to that part of it.

3. "Q. Did complainant Mrs. Ella Walker own any stock on this farm in question? If so what became of it? A. She owned the jennet and her colts. I knew nothing of any else. This jennet had six colts—good jack colts. Mr. Walker (her husband) sold the grown jacks and Mr. W. M. Walker told me they brought $1,000—$500 each; and he also told me that he gave the checks for the $1,000 over to his brother Marcus L. Walker to pay on the farm where he lived.

4. "Q. Were these jennets, colts and jacks the property of Mrs. Walker or Mr. Walker? A. My understanding was they were all hers individually.

"(Defendants except to the understanding.)

5. "Q. What information if any did you have as to who was the owner of those colts, jacks etc.? A. I had a heap of dealings with him (Mr. W. M. Walker) and he always talked like they were all hers, and always asked her to sanction any trade or sale he made of them.

6. "Q. Did you ever advise Mrs. Ella Walker to sell any of her stock? A. Only in his presence, I would tell her when a good trade could be made, what they were worth.

7. "Q. What interest did Mrs. Ella Walker manifest in this stock? A. She watered it, fed it as her own; and I supposed and believed all the while that they were her own.

" (Defendants except to any belief.)

8. "Q. Did Mrs. Ella Walker ever ask your advice about handling or selling this stock? A. Well, not specially except when he was there and heard; but she did then, and occasionally in fact nearly every time I was there.

9. "Q. Did Mr. W. M. Walker ever tell you how the deed was to be made? A. No, sir.

10. "Q. What was the general belief and reputation in the neighborhood as to who owned this stock? A. Everybody that I heard name it thought Mrs. Ella Walker owned it and that was the neighborhood belief.

" (Defendants except to evidence of belief of neighborhood as incompetent.)

11. "Q. What did Mrs. Ella Walker do on the farm? A. She worked a great deal for a woman; more than she ought to have done. I never saw her plow, but I have seen her toting manure a half a mile to put in the garden, and carrying water a long ways to those jacks."

Miss Roy Ames, a sister of complainant, who visited Buck Walker's home frequently, testified as follows:

12. "Q. What property did Mrs. Ella Walker own as her separate estate? A. She owned a mule and horse (a mare) that was sold and put in this place—Mr. Buck told me of this himself.

13. "Q. What property of complainant Mrs. Ella Walker was put in by her to help buy this farm of Mr. Marcus L. Walker? A. The horse and mule was paid on the place Mr. W. M. Walker (Buck) told me that himself.

14. "Q. Did Mr. W. M. Walker (Buck) recognize that his wife Ella owned property as her separate estate? What did he say about it? A. Yes, Buck, Mr. Walker would always call certain stock on the farm his wife's, designating it as his wife's or Mrs. Walker's or Ella's. I can't recall all the stock he called Ella's.

15. "Q. To refresh your memory did or did not Buck ever call the jack or jennet Ella's? A. I have heard (Buck) Mr. W. M. Walker say that Ella's money paid for them.

" (Exception by defendants as leading and suggestive.)

16. "Q. Did complainant Ella work on the farm for several years prior to the making of this deed to Buck? A. Yes. She worked hard; harder than most men do nowadays; she did all kinds of farm work; cooking, milking, working in the garden; cutting wood; I've seen her go out and bring up the wood like a man; she did a big part of feeding and watering the stock; I think she did more of that than he did."

We also quote from the deposition of the witness T. C. Whitely as follows:

1. "Q. State your age, residence and occupation? A. I am forty-three; reside near Antioch, am a farmer.

2. "Q. Did you know Mrs. Ella Walker, complainant and her husband and the place in question? A. Yes.

3. "Q. Did Mrs. Ella Walker own any live stock there during the last five or six years? A. Yes.

4. "Q. What stock? A. A grey mare and a mule, nine sheep, a jennet and colts.

5. "Q. What became of her said stock? A. From what I could learn it was sold to help pay for the place.

" (Objected by defendant as hearsay.)

6. "Q. Who did you learn this from? A. Mr. W. M. Walker.

7. "Q. What did Mr. W. M. Walker tell you as to the ownership and disposition of this live stock? A. I was there thrashing some oats; Mr. Guy Hibbett wanted to trade Mr. W. M. Walker out of the mare and mule—and Mr. W. M. Walker declined saying 'Mr. Hibbett, I can't trade that stock; they belong to my wife and I couldn't and wouldn't trade them' then Hibbett wanted to trade him out of the big horse, Mr. Walker refused saying that Mrs. Walker, his wife, had to have that horse to go to town with and work when he was unable to go and work. I just heard that conversation, it was about six or seven years ago.

8. "Q. Whose stock was used to help get a deed to that farm? A. I don't know exactly, but I heard Mr. Walker say he wanted to sell the jack to a Wilson county man for $700. I heard Mr. Walker say he wanted to sell the jack to get money to pay on the farm so as to finish paying on it.

9. "Q. Whose jack was that Mr. Walker was trying to sell for $700. A. Mr. Walker claimed that the jacks belonged to his wife.

10. "Q. Whose sheep were those there on that farm? A. I went there to buy some sheep and Mr. Walker told me his wife had some sheep she had raised; that she wanted to sell two of them—one of them she had raised by hand. Mr. Walker told we whatever trade I made with his wife would be O. K. as they were hers.

11. "Q. Did Mrs. Ella Walker work on this place? And Mr. Walker? A. She worked all the time. Mr. Walker when he took a notion, but he generally didn't take a notion; he generally walked about over the farm with his hands behind his back. I don't work myself except when I have to; don't hurt myself at that. If I had a wife like Mr. Walker had I could work less."

William Kirk bought three mules and a grey mare for $290 from Buck Walker and Buck told witness that he was selling the stock "to get money to pay on that place where they lived;" that he "would not be selling them except for that." The witness said, however, that he bought the stock from Mr. Walker, and did not know that Mrs. Walker had any claim on it.

I. N. Kimbro a neighbor of complainant and her husband, testified that "the cow and grey mare belonged to Miss Ella" (the complainant), and that "she sold the cow and bought the mare."

J. T. Ames and W. H. Ames, brothers of complainant, testified that complainant owned some live stock on the farm. J. T. Ames said that she owned a jennet, colts, mare and some cattle. W. H. Ames said that complainant owned "some sheep, cows, horse, number of jacks and jennets."

To meet the complainant's evidence, tending to prove her ownership of the live stock claimed by her as before stated, the defendants proved by Ace Cone that Buck Walker bought the jennet at the house of witness, from a man by the name of Fite, and paid $85 cash for her, and did not state that he was buying the jennet for his wife. It also appears from the testimony of Marcus Walker that at the time he sold the farm to his brother Buck that Buck "said he had some stock he had raised on the place and as he sold the stock he would pay for the place." Marcus testified further that he did not see complainant from the time Buck bought the place till he got through paying for it (April, 1917 to January, 1920); that complainant's money was not spoken of in the trade at any time before the deed was made, and that the only time he had ever heard complainant claim that her money or property was used in the purchase of the farm (prior to the filing of the bill in this case) was on one occasion after Buck's death when complainant asked him (Marcus) "how much the last payment was," and said that "she had four hogs in the last payment."

It also appears that complainant, as administratrix, advertised and sold, at public sale, certain personalty as the property of the estate of her deceased husband, and among other things thus sold was the jennet in controversy.

We are of the opinion that the circumstances thus offered in evidence by defendants are not sufficient to disprove complainant's ownership of the live stock claimed by her. We are not dealing with a case where credit was extended to the husband on the faith of his ostensible ownership of the property. The rights of creditors or of innocent purchasers are not involved. The failure of complainant's husband to disclose the fact that the $85 in money with which he paid for the jennet, when he bought her from Fite, and that $1,340 of the money paid for the farm, belonged to his wife, did not make it any the less her money, or defeat her interest in the property purchased. An agency may be undisclosed and none the less an agency.

Complainant's theory is that the two jacks in controversy were her property because they were foaled by her jennet. Defendants say that the fact that complainant, as administratrix, sold the jennet, as a part of her husband's estate, was an admission by complainant

that the jennet was not her separate property. Doubtless it was prima facie an admission that would have estopped complainant from claiming the jennet or its proceeds as against a purchaser at the sale or a creditor of the husband's estate; but the presumption raised by such an act was rebuttable. It is no uncommon thing for a widow to apply her own money or personalty to the payment of the debts of her deceased husband in order to avoid the necessity of a sale of his land to pay debts.

We are satisfied from the evidence that $1,340 of complainant's money was applied to the payment of the purchase-price of the land in controversy, and that upon the execution and delivery of the aforesaid deed of January 27, 1920, W. M. Walker took and held title, as trustee for complainant, to an undivided share of said land, in the proportion which $1,340 bears to the entire consideration of $2,100. 3 Pom. Eq. Juris. (4 Ed.), sec. 1038.

But the right to set up a resulting trust may be waived. Brown v. Brown, 107 Tenn., 349, 352. And in the case now before us it is insisted by defendants, in their answer to the bill and through their assignments of error, that complainant is estopped (1) by her acquiescence when she learned that the land had been conveyed to her husband as sole owner in fee simple; (2) by her reliance on her husband's promises to make a will in her favor, and (3) by soliciting and accepting from the defendants a deed to a life estate in the land.

We are not inclined to hold that complainant is estopped because she was induced to delay the assertion of her rights by her husband's promise to will the land to her; but the complainant's acceptance of the deed from defendants after her husband's death presents a more serious question.

With full knowledge on her part that defendants did not concede that she had any interest in the farm, except homestead and dower, complainant sought and obtained a deed by which defendants conveyed the whole of said tract of land to complainant for the term of her natural life. Defendants had an undivided fee-simple estate in said land, with a present right to possession of two-thirds of their share; hence, this case does not fall within the ruling in Rogers v. Colville, 145 Tenn., 650, 660, because defendants parted with an available right to a present interest in the land, and to that extent suffered an injury.

In this connection, it may be remarked that, under our ruling with respect to complainant's ownership of an undivided interest in the land by reason of her payment of $1,340 of the purchase money, complainant was not entitled to homestead therein, because of the well-settled rule in this State that there can be no homestead in undivided interests in land. Case v. Joyce, 89 Tenn., 337.

Complainant testifies that when she accepted the deed to the life estate from defendants, she did not agree to forego any claim she might have to the fee in said land, and that it was not her purpose to do so. The existence or nonexistence of an estoppel is not to be determined by complainant's purpose or intention, but by the reasonable and natural interpretation of her acts, and the consequences thereof. Taylor v. Taylor, 6 Higgins, 268, 272.

A fraudulent intention to deceive or mislead is not essential to create an estoppel. "If one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent." 2 Pom. Eq. Juris. (4 Ed.), sec. 818.

Complainant does not claim that at the time she procured and accepted the deed from defendants she was under any misunderstanding of the facts or misapprehension of her rights. She accepted and retained the deed from defendants and has never expressed a will·· ingness to surrender the benefits obtained through that deed. We think the effect of complainant's acceptance and retention of said deed from defendants was, under the circumstances, a waiver of any claim on her part to an interest in the fee of said land. In other words, the learned Chancellor erred in declining to sustain the estoppel pleaded by the defendants.

Under this ruling the complainant will have a home and the use of a farm of one hundred acres for the remainder of her lifetime, and at her death the property will revert to the heirs of her deceased husband. We are inclined to think that, after all, this result will meet the "natural justice" of the case.

Defendants assign error upon the action of the Chancellor in excluding certain parts of the testimony of M. L. Walker and J. J. Walker. The excluded testimony of these witnesses was preserved by bill of exceptions and is set out at length in the third assignment of error. The substance of this testimony is that M. L. Walker agreed to convey the land to his brother, W. M. Walker, for $900 less than its value, and afterwards "released" $300 more of the purchase-price, upon a parol agreement and understanding at the time that, upon the death of W. M. Walker and his wife, the property should go back to the "Walker heirs"—that is, the heirs of W. M. Walker. We are of opinion that the Chancellor did not err in excluding this testimony, because its effect would have been to engraft upon the deed to W. M. Walker a limitation or restriction not expressed in the deed, and which was repugnant to the absolute fee thereby conveyed. McGannon v. Farrell, 141 Tenn., 631, 636.

Through their fourth and fifth assignments of error the defendants make the question of estoppel,—that is, they assert that the Chancellor erred in not adjudging and decreeing that complainant is

estopped since she asked and accepted and recorded and still retains the deed from the "Walker heirs" for a life estate in the farm involved in this case.

The first assignment of error is that the Chancellor erred in adjudging and decreeing the farm involved in this case to the complainant (meaning, we assume, the fee-simple estate in the farm). And the second assignment of error is that the Chancellor erred in adjudging the costs of this case against the defendants.

The fourth, fifth, first and second assignments of error are sustained. The remaining assignments of error are overruled.

It results that the decree of the Chancellor is reversed, and a decree will be entered dismissing the complainant's bill, and adjudging the costs of the cause, including the cost of the appeal, against the complainant Mrs. Ella Walker.

## ON PETITION FOR REHEARING.

FAW, P. J. On a former day of the present term the decree of the chancery court in this case was reversed and the complainant's bill was dismissed at her cost. An earnest but respectful petition has been filed on behalf of complainant asking us to reconsider and rehear the case and that "the decision be so changed as to let her (complainant) return the release deed, and to have a decree for $1,340 out of the farm, and that she be not taxed with the costs at all."

After a careful consideration of the petition, we feel compelled to adhere to the views expressed in our former opinion filed on December 19, 1925.

The offer (made by complainant for the first time in her petition for a rehearing) to surrender the life estate conveyed to her by defendants, on condition that she have a "decree for $1,340 out of the farm" cannot be accepted. The case must be tried on the record made in the chancery court, and it does not appear therefrom that complainant was under any misunderstanding of the facts at the time she procured and accepted the deed from defendants or at the time she filed her bill in this case.

It may be well to say here that, were the estoppel out of the way, complainant would not be entitled to "$1,340 out of the farm." The language of the petition indicates that the petitioner (or the draftsman of the petition) construes our former opinion as holding that, but for the estoppel upon her resulting from the acceptance of the deed for a life estate, the complainant would be entitled to a decree for $1,340, to be satisfied out of the proceeds of the land involved in this case. This is an erroneous interpretation of our opinion. We held that upon the execution and delivery by M. L. Walker of the

deed of January 27, 1920, "W. M. Walker took and held title, as trustee for complainant, to an undivided share of said land, in the proportion which $1,340 bears to the entire consideration of $2,100." In other words, the complainant would, but for the estoppel, now be the owner of an undivided interest in the fee of said land to the extent just indicated above. Whether such undivided interest would be worth $1,340, or more, or less, would depend on whether the land as a whole was worth $2,100, or more, or less.

The petition seems to proceed also upon the erroneous assumption that, after carving out the interest to which complainant was entitled by reason of the payment of $1,340 of the purchase price, she was entitled to an allotment of both homestead and dower out of the remainder. Complainant was entitled to dower, but not homestead. As pointed out in our former opinion, there can be no homestead in undivided interest in land. The concession by defendants that complainant was entitled to homestead was based on their assumption that W. M. Walker was the owner of the entire estate in fee at the time of his death.

The petition for a rehearing is denied and dismissed at the cost of petitioner.

Crownover and DeWitt, JJ., concur.