
IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 22, 2017 Session

**PEGGY PATTERSON v. SHANE PATTERSON**

**Appeal from the Circuit Court for Cannon County**
**No. 15-CV-16      J. Mark Rogers, Judge**

_____

**No. M2016-00886-COA-R3-CV**

_____

Stepmother filed a detainer warrant against Stepson and was awarded possession of the real property in the general sessions court. Stepson appealed to the circuit court, and a bench trial was conducted. The trial court awarded the property to Stepmother. We affirm the trial court's finding that no resulting trust was proven. Although we affirm the trial court's finding of unjust enrichment for the improvements on land based on the three-part test under ***Freeman Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512, 525 (Tenn. 2005), we reverse the trial court's award of $37,000.00 to Stepson for the improvements to the property because Stepson failed to prove the correct measure of damages at trial. Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which BRANDON O. GIBSON and KENNY ARMSTRONG, JJ., joined.

Joshua A. Jenkins, Murfreesboro, Tennessee, for the appellant, Peggy Patterson.

B. Nathan Hunt, Clarksville,, Tennessee, for the appellee, Shane Patterson.

**OPINION**

**BACKGROUND**

Plaintiff/Appellant Peggy Patterson ("Stepmother") and her husband Milburn Wayne Patterson ("Father," and, together with Stepmother, "Homeowners") bought the subject real property located at 1429 Mingle Hollow Road, Woodbury, Tennessee, ("property") on December 11, 2003. It is undisputed that Homeowners contributed the

down payment on the property, the deed to the property is in the Homeowners' names, and that Defendant/Stepson Shane Patterson ("Stepson"), Father's son from a prior relationship, did not contribute to the down payment. It is also undisputed that Stepson was allowed to live on the property at some point after the purchase of the property and that Stepson was to pay the monthly mortgage, homeowners' insurance, property taxes, and utilities, which were all in the Homeowners' names. The circumstances surrounding this agreement, however, are sharply disputed. To further complicate matters, Father passed away in March 2015.

Following Father's death, Stepmother filed a detainer warrant in the Cannon County General Sessions Court seeking to regain possession of the property, and a detainer summons was issued on May 14, 2015. After a hearing on July 7, 2015, Stepmother was awarded possession of the property. Stepson timely appealed to the Cannon County Circuit Court ("trial court") and deposited a $7,885.80 cash bond to "secur[e] payment of mortgage payments of [twelve] months[.]" Sometime in August 2015, Stepson filed an answer and counter-complaint. Although Stepson acknowledged that only the Homeowners' names are on the deed to the property, Stepson denied that Stepmother was entitled to possession of the property. According to Stepson, the parties and Father entered into an agreement prior to the purchase of the property, wherein Homeowners would purchase the property and Stepson would be responsible for the mortgage, property taxes, utilities, and insurance, with the understanding that the property would eventually be conveyed to Stepson.[1] As a result, Stepson requested that the trial court impose a constructive trust on the property and transfer ownership to Stepson subject to the remaining mortgage balance. In addition, Stepson asserted that he made "all payments" on the mortgage and the property taxes and therefore was entitled to credit or offset of those amounts.[2] In addition, Stepson attached Father's purported will, which appeared to devise the property to Stepson. Stepson further alleged that, if the trial court declared Stepmother to be owner of the property, Stepmother would be unjustly enriched because Stepson made repairs and improved the property. Stepson later was allowed to amend his counter-complaint to add a claim for resulting trust based on his payments of the mortgage, property taxes, utilities, and insurance.

On August 26, 2015, Stepmother answered the counter-complaint, denying all material allegations, and sought to dismiss Stepson's counter-complaint. Stepmother alleged that Father could not have conveyed the property to Stepson by will because she, as a tenant by the entirety, was entitled to the property after Father's death. Stepmother

[1] The terms of the arrangement are unclear. Based on our review of Stepson's testimony at trial, Stepson's obligation appears to be that he would make these payments directly to the companies.

[2] Later in the counter-complaint, Stepson conceded that Father made a few mortgage payments when Stepson experienced financial hardship. However, Stepson contended that all of those payments had been reimbursed. Despite later testimony by Todd Patterson, Stepson's brother ("Brother"), that he also assisted Stepson in making some payments toward the property, Stepson does not mention any purported payments by Brother on behalf of Stepson in his pleadings.

further alleged that Stepson was barred by the statute of frauds from pursuing any action to enforce the alleged contract to deed Stepson the property.

A bench trial was held on February 8, 2016. The testimony at trial generally concerned (1) whether Homeowners purchased the property for Stepson's benefit and with the intent to eventually convey it to Stepson; and (2) who actually made the required payments over the years on the property, such as the mortgage, property taxes, utilities, and insurance. The evidence on these issues is largely conflicting. Stepmother first testified that she and Father bought the property after learning about it from a family friend and introduced into evidence a warranty deed that conveyed the property to her and Father. According to Stepmother, she and Father discussed the purchase "quite a bit" but that, because she suffered a stroke, Father bought the property in their names while she was at the hospital. Stepmother denied that Stepson contributed any amount toward the down payment. Stepmother also noted that Stepson did not participate in the closing and denied the existence of any agreement purporting to convey Stepson the property. After Homeowners purchased the property, Stepmother testified that the property "just sat there" but that eventually Stepson was allowed to live on the property in exchange for his payment of the mortgage, property taxes, utilities, and insurance.

Stepmother's testimony regarding the mortgage payments for the property was conflicting. Initially, Stepmother contended that the Homeowners "always paid" the mortgage then immediately conceded that Stepson made "a few payments" while he was living at the property. Stepmother later conceded, however, that Stepson made "[m]aybe four or five" mortgage payments. Stepmother mentioned that Stepson's failure to make the payments was due to the fact that he was not employed. Stepmother did not mention in her testimony any mortgage payments purportedly made by Brother on Stepson's behalf. In any event, Stepmother again denied that Stepson had ever reimbursed Homeowners for any mortgage payments.

Stepmother's testimony regarding the other financial obligations on the property was more consistent. For example, Stepmother testified that the utilities, property tax records, and homeowners' insurance were either in Father's name or in the Homeowners' names. With respect to the homeowners' insurance, Stepmother testified that Father made those payments before he passed away but that Stepson took over the payment obligations after Father's death. Stepmother agreed, however, that Stepson paid for all of the utilities and homeowners' insurance for several years but that he stopped making the insurance payments one and one-half years before trial. Stepmother further testified that Homeowners "pa[id] [the property taxes] every year" for the subject property.

When asked whether Stepmother had "any knowledge" of any repairs or improvements made to the property by Stepson, Stepmother responded that she "[didn't] know of any." Stepmother contended that Father "put up a barn" and made repairs and

improvements "until he got ill." Stepmother denied asking Stepson to make any repairs and denied that Stepson ever requested that Stepmother pay for the improvements.

Stepson's testimony sharply conflicted with Stepmother's with regard to the ownership of the property. First, Stepson testified that he was renting a trailer in Murfreesboro prior to 2003 but that he desired to own land in Cannon County. Because of his bad credit, however, Stepson testified that Homeowners, Stepson, and Brother, had a meeting to discuss an arrangement whereby Homeowners would purchase property for Stepson's use and benefit. According to Stepson, Homeowners agreed to help Stepson co-sign for the property with the understanding that if Stepson paid the mortgage, property taxes, utilities, and insurance, that the property would eventually be his; however, Stepson admitted on cross-examination that he did not sign any documents obligating him to make those payments on the property or obligating Homeowners to eventually transfer the property to Stepson. Shortly after the meeting, a family friend informed the parties about a property in Cannon County that was up for sale. Stepson testified that he did not participate in the closing of the property because he was working. Stepson believed that the down payment on the property was a gift because Father helped Brother open a bail bonding business by gifting him approximately the same amount as the down payment to the property. Stepson also denied that the property was unoccupied subsequent to the purchase; rather, Stepson asserted that he moved in shortly after the purchase in December 2003.

Again, the subject of who made payments toward the financial obligations on the property was a subject of much discussion during Stepson's testimony. According to Stepson, he paid nearly all of the mortgage payments. At times, however, Stepson testified that he required financial assistance. In those situations, Stepson stated that he would ask Father for help, Father would make the payments, and Stepson would promptly reimburse Father for the payments. Stepson estimated that he received such help approximately eight times over the years. Stepson testified, however, that he did not reimburse Father for two of these payments, one of them being a gift for Stepson's birthday.[3] Despite Brother's later testimony that he also helped Stepson make some mortgage payments, Stepson did not mention these purported payments during his testimony.

Stepson testified that he made every property tax payment but that he called and canceled the check he wrote for tax year 2014 after Stepmother reneged on the purported agreement. As support for the payments, Stepson introduced some, but not all, of the receipts for the mortgage payments, property tax payments, the utility payments, and the

---

[3] Although not explicitly stated, Stepson appears to have failed to reimburse Father on the remaining payment.

insurance payments that he paid directly to the companies, but he admitted on cross-examination that the majority of the receipts do not show who made those payments.[4]

Stepson testified that he made the house on the property habitable by undertaking numerous repairs over the years, costing him approximately $1,500.00. Stepson also testified to several other improvements, such as a chicken coop project, costing him approximately $7,000.00/$8,000.00.[5] In addition, Stepson testified that he cleared the property and dug a pond, at a cost of approximately $500.00 in fuel for the bulldozer and $300.00 in bentonite.[6] Stepson also stated that the cost of the new horse barn he built was approximately $22,000.00 to $23,000.00. Stepson admitted that Stepmother never asked him to make any repairs or improvements to the property and that Stepson did not expect to be paid for his efforts.

Brother testified that Father withdrew some money out of his 401(k) to help Brother with a bail bonding business by contributing $50,000.00. Out of fairness, Brother testified that Father helped Stepson with the down payment to the property. Brother corroborated Stepson's testimony that, because of Stepson's bad credit, Stepson sought help from the Homeowners. Brother testified that a discussion occurred one month prior to the purchase of the property wherein the Homeowners agreed to help Stepson purchase the property upon the condition that Stepson would pay for all of the mortgage, property taxes, utilities, and insurance. According to Brother, Father at some point wished to quitclaim his interest in the property to Stepson when he realized that Stepmother would not honor the agreement to convey Stepson the property; however Father's efforts to ensure that Stepson would receive the property ultimately failed. To Brother's knowledge, Stepson made all of the payments that Stepson was required to pay under the purported agreement. Brother noted, however, that shortly before Father's death, Brother made two mortgage payments on behalf of Stepson. Brother indicated that Stepson "paid me most of that money back."

Murphy Smiley, Stepson's nephew and Stepmother's grandson, and Brittany Slate, Stepmother's granddaughter, generally testified about the strained relationship between Stepmother and Stepson. According to Mr. Smiley, the hostility stemmed from Stepmother most of the time. On Stepmother's good days, Mr. Smiley testified that Stepmother's attitude toward Stepson's entitlement to the property vacillated, often expressing conflicting beliefs as to whether Stepson should be permitted to remain on the

---

[4] Although most of the receipts, such as the mortgage payments, do not indicate who made the payments, two of the property tax payments, for the years 2008 and 2009, indicate that they were paid by "Steven Patterson" by check. Stepmother admits that "Steven Patterson" is Stepson.

[5] Initially, Stepson estimated the cost to be approximately $7,000.00, but when he was asked a second time, he estimated the cost to be approximately $8,000.00. As is evident, the trial court mistakenly considered these figures as costs for separate projects.

[6] "[B]entonite" is "[a] silicate clay formed from volcanic ash and used in various adhesives and cements." *The American Heritage College Dictionary* 132 (4th ed. 2002).

property. Mr. Smiley, however, denied that Stepmother ever discussed who owned the property. Ms. Slate generally testified that Stepmother was a truthful person.

At the conclusion of trial, the trial court issued oral findings and rulings and declared that all of the witnesses were credible.[7] On March 21, 2016, the trial court entered a written order. The trial court found that Stepmother was entitled to possession of the property, that Stepmother was unjustly enriched by the repairs and improvements that Stepson made to the property, and that Stepson failed to prove the existence of either a constructive or resulting trust. As a result, the trial court ordered that Stepmother pay Stepson an amount totaling $37,000.00, which represented the following:

| ITEM | AMOUNT |
|------|--------|
| 1. Chicken Coop Repairs | $7,000.00 |
| 2. Barn Wrapped Tin Work | $8,000.00 |
| 3. Horse Barn | $22,000.00 |
| **TOTAL:** | **$37,000.00** |

The trial court specifically found, however, that these improvements did not increase the actual value of the property. Finally, the trial court ordered that Stepmother be awarded $3,381.17 from Stepson's cash bond, which amount represented the unpaid property taxes for tax years 2014 and 2015, prorated amounts for the January 2016 and February 2016 property taxes, and the 2015 homeowner's insurance premium paid by Stepmother. The remaining cash appeal bond was ordered to be returned to Stepson.

### ISSUES

Stepmother raises the following issues for our review, which we have taken from her brief and slightly restated:

1.      Whether Stepson failed to prove that he expected to be compensated, and therefore, unjust enrichment does not exist.
2.      In the alternative, whether the trial court erred in its calculation of damages for Stepson's unjust enrichment claim.

---

[7] Specifically, the trial court stated as follows:

> So if an appellate court is reviewing this, I—oftentimes I'll make findings that someone's credibility has been called into question, or they're just not credible, but I don't find that with regard to any of the parties and the witnesses in this case. They just have different perspectives about what happened, when it happened, and what is to be drawn from that. I tend to give everyone the benefit of the doubt, and everyone trying to put their best foot forward on their own testimony.

Stepson raises the following additional issues:

> 1. Whether the trial court erred in not awarding Stepson the value of the benefit he conferred upon Stepmother with respect to the real property at issue.
> 2. Whether the trial court erred in finding that Stepson had not proven a resulting trust in favor of Stepson with respect to the real property at issue.

## STANDARD OF REVIEW

The trial court heard this case sitting without a jury. Accordingly, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law, and our review is de novo. *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)). Additionally, the trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

## DISCUSSION

## Resulting Trust

We first address Stepson's issue of whether the trial court erred in finding that a resulting trust had not been created. This Court reviews the issue of whether a resulting trust has been formed de novo with no presumption of correctness. *Story v. Lanier*, 166 S.W.3d 167, 184 (Tenn. Ct. App. 2004). A resulting trust has been defined as follows:

> Resulting trusts are those which arise where the legal estate is disposed of, or acquired, without bad faith, and under such circumstances that Equity infers or assumes that the beneficial interest in said estate is not to go with the legal title. These trusts are sometimes called presumptive trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions. They are, however, generally called resulting trusts, because the trust is the result which Equity attaches to the particular transaction.

**Smalling v. Terrell**, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996) (quoting *Gibson's Suits in Chancery* § 382 (Inman, 7th ed. 1988)).  As the Tennessee Supreme Court has stated:

> The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

> While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another—sometimes referred to as a "purchase-money resulting trust"—they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust—on an inquiry into the consideration of a transaction—in order to prevent a failure of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993) (quoting 76 Am. Jur. 2d *Trusts* § 166, pp. 197–98 (1992)).  However, the overriding principle pertaining to resulting trusts is that "the trust must arise at the time of the purchase, attach to the title at that time and not arise out of any subsequent contract or transaction." *In re Estate of Jones*, 183 S.W.3d 372, 379 (Tenn. Ct. App. 2005) (quoting *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980)); *see also* *Frazier v. Pomeroy*, No. M2005-00911-COA-R3-CV, 2006 WL 3542534, at *13 (Tenn. Ct. App. Dec. 7, 2006); *Smalling v. Terrell*, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996).

Resulting trusts can be proven by parol evidence, *Smalling*, 943 S.W.2d at 400 (citing *Estate of Wardell*, 674 S.W.2d at 295; *Bright v. Bright*, 729 S.W.2d 106, 110 (Tenn. Ct. App. 1986)), with the following caveat:

> A trust may rest upon parol agreement where the declaration of trust is made prior to or contemporaneous with the transfer of the interest in realty. *Tansil v. Tansil*, 673 S.W.2d 131, 132 (Tenn. 1984). Ordinarily, the testimony of a single, interested witness would not be sufficient to establish

a trust by clear, cogent and convincing evidence. *King v. Warren*, 680 S.W.2d 459 (Tenn. 1984).

*St. Clair v. Evans*, 857 S.W.2d 49, 51 (Tenn. Ct. App. 1993). "The parol testimony [may be] admitted, not to show an agreement to purchase for another, but to show that the purchase money was paid by the party claiming, notwithstanding the deed was taken in the name of another person." *Justice v. Henley*, 27 Tenn. App. 405, 410, 181 S.W.2d 632, 634 (Tenn. Ct. App. 1944) (quoting *Perkins v. Cheairs*, 61 Tenn. 194, 201 (Tenn. 1872)). Additionally, this Court has stated the following:

> "A trust results from the acts, and not from the agreements, of the parties, or rather from the acts accompanied by the agreements; but no trust can be set up by mere parol agreements, or, as has been said, no trust results merely from the breach of a parol contract; as if one agrees to purchase land and give another an interest in it, and he purchases and pays his own money, and takes the title in his own name, no trust can result." 1 Perry on Trusts, (4 Ed.), sec. 134.

> "It is a familiar rule that a trust must result, if at all, at the instant the deed is taken and the legal title vests in the grantee. No oral agreements, and no payments before or after the title is taken, will create a resulting trust, unless the transaction is such that, at the moment the title passes, a trust will result from the transaction itself. There must be an actual payment from a man's own money, or what is equivalent to payment from his own money, to create a resulting trust." *Clark v. Timmons et al.* (Tenn. Chy. App.), 39 S. W., 534, 535.

*Walker v. Walker*, 2 Tenn. App. 279, 291 (1925). In other words, "a mere parol promise or an agreement by one person to purchase land and give another an interest therein" cannot give rise to a resulting trust. *Greene v. Greene*, 272 S.W.2d 483, 488 (1954). Rather, "[t]he trust arises, if at all, from the fact of payment of the consideration by the cestui que trust,[8] and not from any agreement of the parties." *Walker v. Walker*, 2 Tenn. App. 279, 291 (1925). "Moreover, it must be shown that the beneficiary actually made payment, or incurred an absolute obligation to pay, as part of the original transaction of purchase." *Rowlett v. Guthrie*, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993) (citing *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. App.1980)).

---

[8] A "cestui que trust" means "[s]omeone who possesses equitable rights in property[.]" *Black's Law Dictionary* (10th ed. 2014). "[A]n alternative name for the beneficiary is 'cestui que trust,' an elliptical phrase meaning 'he [for] whose [benefit the] trust [was created].'" *Id.* (quoting Glanville Williams, *Learning the Law* 10 (11th ed. 1982).

At the outset, we note that Stepson's testimony that an agreement had taken place prior to the purchase of the property may not be used to establish a resulting trust. *See Greene*, 272 S.W.2d at 488. Rather, his testimony that he actually incurred an obligation to pay at the time of the purchase of the property would be relevant to support his claim. Stepson does not dispute that he did not contribute to the down payment, did not participate in closing, and did not sign any agreement obligating him to pay for the property. Thus, the issue becomes whether Stepson met his burden of proving a resulting trust based only on his testimony, and Brother's testimony, that he incurred an obligation to pay based on a purported agreement with Homeowners prior to the purchase of the property.

Here, in its written order, the trial court found that Stepmother and Father "used their own money to make the $50,000.00 down payment to purchase the property" and that Stepson "did not participate in the purchase or closing of the [p]roperty and did not furnish consideration for the purchase of the property." As explained by the trial court in its oral rulings:

> Now, I understand the theory. The theory is: Well, I didn't pay the money up front that I had promised. But I find that [Stepson], on the day that he said he promised, that if he chose never to make a first payment, there was nothing they can do about it. They couldn't sue him. They couldn't hold him to his promise. I just don't think any of the evidence established the necessary factors for this [c]ourt to impose . . . a resulting trust.
>
> And really what all that comes down to is trying to get around the Statute of frauds, because there is no writing memorializing that [Stepson] was acquiring any interest in [the property] when it was purchased by [Father] and [Stepmother], none whatsoever. And—and it's an effort to get around what is obviously a very difficult problem. And the burden of proof being such that I just don't feel like [Stepson] established any basis for that, notwithstanding his testimony or the testimony of [Brother].

As a result, the trial court concluded that "a resulting trust has not been proven by the evidence."

Still, Stepson cites *Little v. Watson*, No. M2001-00230-COA-R3-CV, 2002 WL 31467471 (Tenn. Ct. App. Nov. 6, 2002), arguing that the instant case is "the same" as the situation in *Little*, where a resulting trust was found to have been created. In *Little*, although the plaintiffs did not contribute to the down payment on the property, it was undisputed that defendants purchased the house to "help out" plaintiffs, who could not obtain financing and that the plaintiffs made every mortgage payment for a number of years. *Id.* at *1. In a suit between the plaintiffs and defendants for ownership of the property, the trial court found that a resulting trust had been formed in favor of plaintiffs.

- 10 -

The Court of Appeals affirmed, stating that "the critical inquiry is whether the [h]ouse was purchased by the [defendants] for the [plaintiffs] with the understanding, at the time of the purchase, that the [plaintiffs] would pay for the [h]ouse." *Id.* at *5. The Court of Appeals concluded that plaintiffs proved by clear and convincing evidence that a resulting trust had been created in plaintiffs' favor:

> The undisputed, and therefore clear and convincing, evidence herein is that the [plaintiffs] made all mortgage and insurance payments on the [h]ouse for ten years and made those payments directly to the mortgage and insurance companies. Thus, we conclude that the [plaintiffs] paid consideration for the purchase of the [h]ouse. It is also undisputed that the [defendants] bought the [h]ouse for the [plaintiffs] to live in and solely because the [plaintiffs] could not obtain financing at that time. The parties' conduct and the circumstances surrounding the purchase are consistent with an understanding that the [defendants] purchased the House for the benefit of the [plaintiffs]. Had the [plaintiffs] been able to obtain financing in 1989, the [h]ouse would have been bought by them and they would have made the same contribution to consideration for the [h]ouse except for the down payment and closing costs. The parties' conduct for nine years after the purchase is consistent with an understanding that the [plaintiffs] had a beneficial interest in the [h]ouse.

*Id.* at *7.

Unlike *Little*, however, the parties' accounts surrounding the purchase of the property in this case are sharply contested, rather than undisputed. When the material facts surrounding the purchase are in dispute, this Court typically requires that the party claiming a resulting trust either contribute to the initial payment of the purchase price or incur an absolute legal obligation to pay at the time of the purchase of the property. *See, e.g.*, *Frazier v. Pomeroy*, No. M2005-00911-COA-R3-CV, 2006 WL 3542534, at *13–14 (Tenn. Ct. App. Dec. 7, 2006) (noting that, although defendants contributed more toward the initial purchase of the property, plaintiffs' contributions toward the closing costs and mortgage payments constituted clear and convincing evidence that a resulting trust was created in favor of plaintiffs); *Keeton v. Daniel*, No. M2005-01199-COA-R3-CV, 2006 WL 2818238 (Tenn. Ct. App. Oct. 2, 2006) (holding that the claimant's incurrence of "an absolute obligation to pay as part of the original transaction of purchase" by co-signing a loan is "by itself sufficient to establish a resulting trust" despite the fact that the house was inadvertently titled in only the decedent's name); *In re Estate of Jones*, 183 S.W.3d 372, 379 (Tenn. Ct. App. 2005) (holding that widow's contributions to the property after decedent's purchase of the property, such as mortgage payments and improvements to the property, do not establish a resulting trust because nothing in the record suggested that her interest in the property was contemplated at the time of the purchase); *Roach v. Renfro*, 989 S.W.2d 335, 340 (Tenn. Ct. App. 1998) (concluding that plaintiff's resulting

- 11 -

trust theory was without merit when "she stipulated that she did not provide any payment for" the property at issue and offered no proof showing that defendant intended to set up a trust in plaintiff's favor); ***Livesay v. Keaton***, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980) (holding that a resulting trust had not been created because plaintiff's parents bought the land on credit and "plaintiff did not, at the time of the purchase, obligate himself in any way to pay for the land" even though plaintiff made every single mortgage payment and paid the tax bills for forty-one years). One example where this Court has concluded that the proponent of a resulting trust incurred an absolute legal obligation to pay often involves the proponent's execution of a promissory note allowing the purchase of the property. *See **Keeton***, 2006 WL 2818238, at *1 (finding a resulting trust where the plaintiff co-signed the loan allowing the record owner to purchase the property).

Accordingly, where the facts are disputed as to the purpose of the purchase of the property, it seems clear that Tennessee law requires one of the following to be shown by clear and convincing evidence in order to establish a resulting trust: (1) that the party claiming the trust contribute to the initial payment of the purchase price; or (2) that the party claiming the trust incurred an absolute legal obligation to pay at the time of the purchase of the property, typically by signing a promissory note allowing the record owner to purchase the property. Neither scenario has been shown by clear and convincing evidence in this case. First, we note that it is undisputed that Stepson in no way contributed to the purchase of the subject property at the time it was purchased. Furthermore, nothing in the record shows that Stepson incurred an absolute obligation to pay for the property at the time of its purchase; Stepson has not claimed nor shown that he participated in the finance of the property, such as by co-signing the mortgage on the property. Moreover, even if we were to conclude that Stepson's payments of mortgage and taxes in the years following the purchase of the property could be considered in determining whether he incurred an obligation to pay at the time of the purchase of the property, Stepson's obligation to pay was in no way absolute. Indeed, as the trial court found in its oral ruling, Homeowners would have had no legal recourse against Stepson if Stepson had chosen not to provide any of the payments after the purchase of the property pursuant to the purported nonbinding oral agreement. Indeed, Stepson did not dispute that Homeowners were required to make some of the mortgage payments on the property over the years. Based on the foregoing, we cannot conclude that the trial court erred in finding that Stepson failed to establish the necessary elements of a resulting trust by clear and convincing evidence.

### UNJUST ENRICHMENT

We next address Stepmother's contention that the proof at trial did not support Stepson's claim of unjust enrichment because Stepson did not expect to be compensated, negating an essential element of the unjust enrichment claim. Stepson, on the other hand, argues that an unjust enrichment claim does not require that Stepson expected to be

compensated; rather, that element is part of a quantum meruit claim that is not at issue in this case.

The confusion between these two concepts began over fifty years ago, when the Tennessee Supreme Court stated that "[a]ctions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). While unjust enrichment and quantum meruit may be synonymous in that they both involve the "class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto," *id.*, the elements of each claim, as defined by our supreme court, remain distinct. In 2001, the Tennessee Supreme Court listed the following required elements for a quantum meruit action:

> A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> (1) There is no existing, enforceable contract between the parties covering the same subject matter;
> (2) The party seeking recovery proves that it provided valuable goods or services;
> (3) The party to be charged received the goods or services;
> **(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated**; and
> (5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197–98 (Tenn. 2001) (quoting *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998)) (emphasis added). In contrast, in 2005, the Tennessee Supreme Court outlined the following requirements that a plaintiff must prove to prevail under a theory of unjust enrichment:

> The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Paschall's, Inc.*, 407 S.W.2d at 155. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. *Id.*; *Whitehaven Cmty. Baptist Church*, 973 S.W.2d at 596.

- 13 -

***Freeman Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512, 525 (Tenn. 2005). As is evident from the above, the Tennessee Supreme Court has simply not held that the required elements of a quantum meruit claim must also be proven to show unjust enrichment.[9] Moreover, given the Tennessee Supreme Court's clear holding in ***Freeman Indus., LLC***, we have no authority to append additional elements to claims for unjust enrichment under Tennessee law. As such, we see no basis to reverse the trial court's application of the elements under ***Freeman Indus., LLC***, and therefore, affirm the trial court's application of the three-part test.[10]

Stepmother further takes issue with the trial court's factual findings regarding whether Stepson proved that he made any improvements to the property and whether the circumstances rendered it unjust for Stepmother to retain the improvements. At the outset, we note that Stepmother did not properly raise these issues in her statement of the issues; rather, the issue that she raised in her appellate brief was which test the trial court

---

[9] One distinction that we have unearthed between a claim for unjust enrichment and a claim for quantum meruit may be whether the contract at issue is implied by law or implied in fact. For example, in ***Ridgelake Apartments v. Harpeth Valley Utilities Dist. of Davidson & Williamson Cntys.***, No. M2003-02485-COA-R3-CV, 2005 WL 831594 (Tenn. Ct. App. Apr. 8, 2005), this Court quoted favorably an Opinion from the South Carolina Supreme Court in which a quantum meruit claim was defined as a claim based upon a contract "implied in fact." ***Id.*** at *9 (quoting ***Myrtle Beach Hosp., Inc. v. City of Myrtle Beach***, 532 S.E.2d 868, 872 (S.C. 2000)). "Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention to contract." ***Paschall's***, 407 S.W.2d at 154 (quoting ***Weatherly v. Am. Agr. Chem. Co.***, 16 Tenn. App. 613, 65 S.W.2d 592, 598 (Tenn. 1933)). In contrast, our supreme court has indicated that a claim for unjust enrichment rests on a contract implied by law. *See* ***Freeman Indus., LLC***, 172 S.W.3d at 524–25 (citing ***Whitehaven***, 973 S.W.2d at 596) ("Courts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment."). Unlike contracts implied by fact, "[c]ontracts implied in law or quasi contracts are created by law without the parties' assent and are based upon reason and justice." ***Freeman Indus., LLC***, 172 S.W.3d at 524 (citing ***Paschall's***, 407 S.W.2d at 154). Thus, it appears that there may be some distinction between the two claims. This distinction, however, does not appear in all cases. Indeed, some cases have grouped both unjust enrichment and quantum meruit claims as implied in law claims. *See* ***Paschall's, Inc.***, 407 S.W.2d at 154 ("Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same."); ***ICG Link, Inc. v. Steen***, 363 S.W.3d 533, 543 (Tenn. Ct. App. 2011) (citing ***Jones v. LeMoyne-Owen College***, 308 S.W.3d 894, 906 (Tenn. Ct. App. 2009)) ("A contract implied in law is also referred to as a 'quasi-contract' or an action for 'quantum meruit.'"); ***W. Exp., Inc. v. Dollar Gen. Corp.***, No. M2005-02580-COA-R3-CV, 2007 WL 1860751, at *7 (Tenn. Ct. App. June 27, 2007) (quoting ***Paschall's Inc.***, 407 S.W.2d at 154) ("Our cases often use the terms 'unjust enrichment,' 'quasi-contract,' and 'quantum meruit,' interchangeably with contract implied in law. 'Each is based upon an implied obligation where, on the basis of justice and equity, we impose a contractual relationship between parties, regardless of their assent.'"). In this case, we need not distinguish between the two claims, however. Stepson brought this suit under an unjust enrichment claim, and Stepmother does not argue that Stepson brought the wrong claim for the type of implied contract at issue in this case, only that the quantum meruit elements should be applied to Stepson's unjust enrichment claim. As such, we will not consider whether the appropriate claim was brought in this case.

[10] Indeed, during closing arguments, counsel for Stepmother cited only the three elements outlined in ***Freeman Indus., LLC*** as necessary to prove Stepson's unjust enrichment claim.

should have applied in connection with an unjust enrichment claim. "We may consider an issue waived where it is argued in the brief but not designated as an issue." ***Forbess v. Forbess***, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (citing ***Childress v. Union Realty Co.***, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002)); *see also* Tenn. R. App. P. 27(b) (requiring that an appellant's appellate brief must include "the contentions of the appellant with respect to the issues presented"). As such, we conclude that Stepmother's arguments with regard to the trial court's factual findings are waived.

In any event, the resolution of this issue is not necessary to our determination in this case, as we have determined that another deficiency is fatal to Stepson's claim of unjust enrichment related to the improvements to the property. Specifically, we agree with Stepmother that the trial court utilized an incorrect measure of damages in its award for unjust enrichment resulting from the improvements to the property. With respect to the measure of damages for unjust enrichment based on improvements on property, this Court has stated the following:

> [A] plaintiff's recovery for unjust enrichment for improvements the Plaintiff made to another person's land is the "amount by which the improvements enhance the value of the land." ***Simpson v. Davis***, No. W1999-00689-COA-R3-CV, 2000 WL 1346609, at * 4 (Tenn.Ct.App. Sept. 15, 2000); *see also* ***Simpson v. Bicentennial Volunteers, Inc.***, No. 01A01-9809-CV-00493, 1999 WL 430497, at * 2 (Tenn. Ct. App. June 29, 1999) (holding that "[t]he amount of recovery [in an unjust enrichment claim] is the value of the benefit conferred, not the cost to the furnisher").

***Kuderewski v. Estate of Hobbs***, No. E2000-02515-COA-R3-CV, 2001 WL 862618, at *5 (Tenn. Ct. App. July 30, 2001). "The party seeking to recover using an unjust enrichment theory has the burden of proving it is entitled to relief." ***D.T. McCall & Sons v. Seagraves***, 796 S.W.2d 457, 464 (Tenn. Ct. App. 1990) (citing ***Bokor v. Holder***, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986)).

Here, the trial court found that "[t]here was no proof, evidence or testimony, regarding the value of the [p]roperty other than the purchase price and the amount financed and no testimony that the value of the [p]roperty was improved by the improvements." Nevertheless, the trial court awarded Stepson $37,000.00 based on Stepson's testimony of the costs he expended to make the improvements. Stepson does not dispute that he erroneously introduced proof of his costs incurred at trial to establish the value of the improvements nor does he dispute that the correct measure of damages is the amount that the improvements enhanced the value of the property. Still, Stepson argues in his appellate brief that the property tax statements "can show the change in the appraised value of the [property] from 2003 to 2014, during which time Stepson made improvements." Although property tax receipts were filed as exhibits from 2006—not 2003—to 2013, with figures purporting to represent land values and improvement values,

Stepson was forced to concede at oral argument that "there is no way to know" which portion was due to the improvements made to the property versus market forces. Indeed, at trial, the tax receipts were not introduced for the purpose of showing that Stepson's improvements increased the property value but rather were introduced solely to prove that Stepson paid the property taxes. Accordingly, based on Stepson's failure to meet his burden of proving the correct measure of damages at trial and the trial court's explicit finding that "no testimony that the value of the [p]roperty was improved by the improvements[,]" we must reverse the trial court's award of $37,000.00 to Stepson. Because of this reversal, we pretermit the following arguments: (1) Stepmother's alternative argument that the trial court miscalculated the figures provided at trial producing the $37,000.00 amount in damages; and (2) Stepson's argument that the trial court erred in not awarding him additional damage awards for several other improvements, including his costs incurred in placing the floors and building a pond, based on the reasoning articulated above.

We finally address Stepson's argument that the trial court erred by not awarding him a refund of his payments of the mortgage, property taxes, utilities, and insurance, which he also couched under his claim of unjust enrichment. Whether these payments constitute a benefit to Stepmother is a question of fact. *See Simpson v. Bicentennial Volunteers, Inc.*, No. 01A01-9809-CV-00493, 1999 WL 430497, at *2 (Tenn. Ct. App. June 29, 1999) ("We think that whether [defendant] received a benefit from [plaintiff's] service is a question of fact."). Here, as Stepson points out, the trial court did not make any findings with respect to this argument. Bench trials in civil cases are subject to the requirements of Rule 52.01 of the Tennessee Rules of Civil Procedure, which states the following:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

Tenn. R. Civ. Pro. 52.01. This Court has previously held that the General Assembly's decision to require findings of fact and conclusions of law is "not a mere technicality." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.*; *White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)).

Although the trial court explicitly found unjust enrichment based on the improvements to the property, the trial court did not address whether unjust enrichment

existed with respect to the monetary payments that Stepson made. Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law includes "remand[ing] the cause to the trial court for written findings of fact and conclusions of law." *Lake v. Haynes*, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, this Court has indicated that we may "soldier on" with our review despite the trial court's failure to make sufficient findings of fact and conclusions of law, in certain limited circumstances:

> On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court "may 'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.'" *Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at * 10 (Tenn. Ct .App. Nov. 21, 2012) (quoting *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, at *4 (Tenn. Ct. App. Aug. 28, 2012)).

*Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013).

This dispute concerns whether Stepson's payment of the mortgage, property taxes, utilities, and insurance constitutes unjust enrichment to Stepmother, and, if so, whether her retention of these payments is unjust. The Tennessee Supreme Court has provided the following guidance on this issue:

> The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust. Consequently, if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher.

*Paschall's, Inc.*, 407 S.W.2d at 155; *see also Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 597 (Tenn. 1998) (holding that the unjust enrichment claim was properly dismissed because the defendants provided consideration for both the improvements and the property, and, therefore, it was not unjust for the defendants to retain this property with its improvements); *Venture Const. Co. v. Apple Music City, Inc.*, 847 S.W.2d 509, 511 (Tenn. Ct. App. 1992) (holding that lessor was not unjustly enriched when lessor furnished money to the lessee for payment of construction costs even though the lessee did not pay the construction company the amount it was due for the work). "It is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." *Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985). Here, without deciding whether Stepson conferred a benefit on Stepmother, it is undisputed that Stepson agreed to pay the mortgage, property taxes, utilities, and insurance while he lived on the property. Thus, by allowing Stepson to live on the property, which Stepmother, as

co-owner of the property, was under no obligation to do, it appears that Stepmother provided some consideration in exchange. As previously discussed, "any consideration" would negate a finding of unjust enrichment. Under these circumstances, it was not unjust for Stepmother to retain the benefit of Stepson's payments of the mortgage, property taxes, utilities, and insurance. As a result, the trial court did not err in failing to award Stepson damages based on his payment of the mortgage, property taxes, utilities, and insurance.

## CONCLUSION

Based on the forgoing, we affirm the Cannon County Circuit Court's ruling that no resulting trust had been proven, affirm the trial court's ruling of unjust enrichment with respect to the improvements to the property, reverse the trial court's award of $37,000.00 to Stepson based on the improvements, and remand for further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to the Appellee, Shane Patterson, for which execution may issue if necessary.

 

_____
J. STEVEN STAFFORD, JUDGE